## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ADVANCE SERVICES, INC., | ) | CASE NO.  8:03CV108 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| CANDLEWOOD SHELLS, HUNTER | ) | **AND ORDER** |
| WISE FINANCIAL GROUP, WHITE | ) | |
| HAT FOOD & BEVERAGE GROUP, | ) | |
| GARY F. PRYOR, and FRANK | ) | |
| PATTON, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the parties' stipulation of partial dismissal (Filing No. 174) and the separate motions for summary judgment filed by Defendant Frank Patton (Filing No.149) and by Defendants Gary F. Pryor and Hunter Wise Financial Group (Filing No.148).  In the stipulation, the parties agree that Count II based on a theory of alter ego liability should be dismissed without prejudice as to Defendants White Hat Food and Beverage Group, Gary Pryor and Frank Patton, and their stipulation shall be approved. The motions for summary judgment have been fully briefed (Filing Nos. 150, 154, 159, 161, 164, and 166), and the parties have filed evidence in support and in opposition to the motions (Filing Nos. 151-153, 160, 162, and 165).[1]  Because I find that there are no genuine issues of material fact that remain to be decided relative to Count III based on a theory of fraud and Count IV based on a theory of unjust enrichment, I conclude that the movants are entitled to judgment as a matter of law, and their motions shall be granted.

---

[1] Because there are numerous and sometimes duplicative evidentiary filings, citation to the evidence will be to the actual deposition and page number, affidavit and paragraph number, or deposition exhibit ("Ex.") as referenced by the parties.  I note that deposition excerpts of Frank Sandall may be found at Filing Nos. 153 and 160, and that the deposition of Paul Sandall may be found at Filing No. 165.

The sole remaining claim for trial is the breach-of-contract claim in Count I asserted against Defendant Candlewood Shells, LLC.

### Summary Judgment Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  *Cordry v. Vanderbilt Mortg. & Finance, Inc.,* 445 F.3d 1106, 1109 (8th Cir. 2006*) (quoting Bockelman v. MCI Worldcom, Inc.,* 403 F.3d 528, 531 (8th Cir. 2005)).  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The proponent need not, however, negate the opponent's claims or defenses.  *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable . . . or is not

2

significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (citations omitted).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327.

### Undisputed Factual Background

#### *Advance, Heartland Gold, and McPherson Production*

Advance Services, Inc. ("Advance") is a Nebraska corporation in the business of providing temporary labor to manufacturing and production companies. Advance began providing temporary labor to Heartland Gold Foods, Inc. ("Heartland Gold") at least as early as March 2000. (Warren Aff. Ex. E). Heartland Gold was producing pizza shells for Papa John's restaurants in a manufacturing plant located in McPherson, Kansas. The plant was owned by McPherson Production Company. By late 2001, Heartland Gold was delinquent in the amount it owed to Advance.

Paul Sandall is the owner and president of Advance. Frank Sandall, Paul's brother, was at all relevant times the Vice President of Advance and acted as a regional manager whose region included the Heartland Gold account. Frank Sandall and Advance employee Greg Wagner managed the Heartland Gold account through late August 2002, at which time Paul Sandall and Advance's Risk Manager, Dave Warren, took over day-to-day management of the Heartland Gold account.

In December 2001, an affiliate of Papa John's International known as PJ Gold and McPherson Production executed an option agreement pursuant to which PJ Gold held the option to purchase the McPherson facility and other assets, and the option agreement was eventually extended to October 31, 2002.   On or about July 1, 2002, PJ Gold and McPherson Productions executed a "Facilities Use Agreement" through which PJ Gold secured the right to withdraw from the purchase agreement in exchange for a $100,000 payment to McPherson, that has been referred to as the "break-up" provision.   The Defendants learned of the provision on or about July 11, 2002. (See, *i.e.*, Kuluris Dep. 34-43; 53-54)

In February 2002, Heartland Gold and PJ Gold entered into an open-ended contract pursuant to which Heartland Gold agreed to produce approximately 500,000 pizza shells for PJ Gold.  This contract was extended on a limited basis throughout 2002.   Advance continued to provide temporary labor to Heartland Gold.

By June 2002, a portion of Heartland Gold's account was more than 60 days delinquent, and Heartland Gold owed Advance more than $180,000.   Advance was authorized by its bank to use its accounts receivable as collateral against a line of credit, provided the accounts were not more than 60 days overdue.  (Filing No. 160, Warren Aff. ¶ 7-9).  Because of this financing arrangement, Advance focused on the amounts on any account that were more than 60 days overdue - referred to by Advance as "ineligibles."  It was not uncommon for Advance to have accounts that included some ineligible amounts. (P.Sandall Dep. at 84).

***Candlewood, White Hat, Pryor, Patton and Hunter Wise.***

In early 2002, Hunter Wise Financial Services ("Hunter Wise") was approached to provide financing to purchase the assets of Heartland Gold.  At the time, Tim Riedel, Bradley Kuluris, Gary Pryor and Frank Patton were independent contractors for Hunter Wise.  Together, these four individuals decided to purchase the pizza shell manufacturing business from Heartland Gold.   On June 17, 2002, they had prepared Articles of Organization for two limited liability companies, White Hat Food and Beverage LLC ("White Hat") and Candlewood Shells, LLC ("Candlewood").   (Patton Aff. ¶¶ 6-8).   The four individuals became members of White Hat and owned a 25 percent share each.  White Hat was the sole member of Candlewood, owning 100 percent.  Candlewood was formed to purchase Heartland Gold and hold the pizza-shell technology, and White Hat was formed to purchase and hold the real property and McPherson plant.  Pryor and Patten were not managers or directors of Candlewood, although they acted as agents for Candlewood. (Pryor Aff. ¶ 11; Patton Aff. ¶¶ 7-10, 17).

Advance has alleged that White Hat's existence and relationship to Candlewood was hidden from it, although the undisputed evidence shows otherwise. White Hat was plainly mentioned in an e-mail that was forwarded to Wagner by Riedel.  (Wagner Dep. at 155; Ex. 177 and 182).  Moreover, Frank Sandall has conceded that if he had known of White Hat's existence, it likely would not  have altered Advance's decisions relative to the Candlewood account.

There is no dispute that some of the work that was performed, and communications that were sent, on behalf of Candlewood and White Hat emanated from the Hunter Wise offices used by Pryor, Patten, Riedel and Kuluris.  In addition, there is no dispute that Patton and Pryor provided background information about themselves and their relationship

5

with Hunter Wise, including their Hunter Wise business cards, to Advance's Sandall brothers and Advance employees. (Warren Aff. ¶ 14).

***Candlewood Purchases Heartland Gold, and Advance contracts with Candlewood***

On July 11, 2002, Candlewood had purchased Heartland Gold. (Filing No. 160). Pursuant to their agreement, Candlewood acquired assets including inventory, the technology necessary to produce the pizza shells, and the remaining work orders from the BLOI with PJ Gold, and Candlewood assumed some of Heartland Gold's liabilities, including the debt owed by Heartland Gold to Advance in the approximate amount of $183,000.  (Riedel Dep. Ex. 74).

On July 11, 2002,  Advance and Candlewood executed a contract entitled, "Terms of Agreement" pursuant to which Advance agreed to continue to supply temporary labor to the McPherson facility at rates that Candlewood agreed to pay.   It is undisputed that the first draft of the agreement between Advance and Candlewood was prepared by Advance employee, Greg Wagner, and sent to Riedel.  When Riedel reviewed the first draft of the agreement, he noted that the draft incorrectly identified Hunter Wise as the contracting party.  Riedel told Wagner to change the name of the contracting party from Hunter Wise to Candlewood Shells, LLC.  Wagner made the change, and Riedel executed the corrected and final "Terms of Agreement." (Wagner Dep. 96-100; Ex. 158).

In part, the Terms of Agreement states:

- "Advance Services, Inc. will bill Candlewood Shells, LLC via the trade name Heartland Gold Foods, for hours employees work," and

- "This document is the entire agreement between Advance Services, Inc. And Candlewood Shells LLC/Heartland Gold Foods.   Any prior understanding or

6

discussions are not binding.  Any changes or added obligations to this agreement shall be in writing and signed by both parties."

(*Id.* at Ex. 158).

Whether the creditworthiness of a client was ordinarily checked by Advance's accounting department at the relevant time is unclear.   (P.Sandall Dep. 54-55). Nevertheless, Advance requested that Pryor complete a credit application for Advance, which he did.  Candlewood is the only entity listed on the credit application.  (Exs. 21 and 156).  It is unclear whether Advance's accounting staff did anything with the application. (Wagner Dep. 105).  Advance concedes that it did not request additional information from Candlewood about its  capitalization or corporate structure, even as the delinquencies on Candlewood's account accumulated. (Wagner Dep. 155; F. Sandall Dep. 155, 212, 245).

Also on or about July 11, 2002, Candlewood and White Hat entered into a contract with PJ Gold to purchase PJ Gold's option rights to the McPherson plant.  The contract required Candlewood and White Hat to arrange for long-term financing to effect the purchase of the plant.  A copy of this contract was sent to Advance on or before September 4, 2002.  (Ex. 186).

At the time the "Terms of Agreement"  was executed, Advance knew that Heartland Gold had become delinquent on its account, and it understood that Candlewood had assumed responsibility for the balance of Heartland Gold's account.  (Warren Aff. ¶ 41, Ex. F). This account, even after it became Candlewood's responsibility, continued to be delinquent.  On July 25, 2002, Advance sought legal advice regarding its management of Candlewood's account. (Wagner Dep. 165, Ex. 185).

7

During a meeting on August 29, 2002, representatives from Advance and Candlewood met in Arizona to prepare a payment plan to address Candlewood's delinquent account.  The meeting was held in the offices of Hunter Wise.  During the meeting, Advance asked for personal guarantees from  Pryor, Patton, Riedel and Kuluris to cover the delinquent amounts.  They refused.  (Patton Aff at ¶23; Frank Sandall Dep. 103-04).  Although a payment plan was approved at the meeting, it was not followed by Candlewood in subsequent months.

On September 3, 2002, Advance renewed its request for personal guarantees from Pryor, Patton, Riedel and Kuluris.  This time, the request was approved to some extent in the form of a promissory note executed by Pryor, Patton, Riedel and Kuluris in favor of Advance in the amount of $81,917.   On September 13, 2002, the promissory note was paid off by Candlewood.  The $81,917  represented only a portion of the total balance due on that date, $434,110.  (Exs. 36 and 37).   In response to a September 5, 2002, letter from Advance's attorneys to Pryor, Candlewood sent a written Acknowledgment of Responsibility for Unpaid Billings to Advance identifying itself as the sole party liable for services rendered by Advance. (Pryor Aff. ¶ 33; Ex. 37).

On October 10, 2002, and then on November 4, 2002, PJ Gold placed another order for 7.5 million six-inch shells that was expressly contingent upon Candlewood having the financing in place to purchase the McPherson facility by a date certain.  (Riedel Dep. Ex. 39).  Also in October 2002, Patton met with Frank Sandall at the McPherson plant, and Sandall told Patton that he didn't know whether Advance could continue supplying labor if Advance wasn't being paid.  Patton told Sandall he understood Advance's concern, and appreciated that Sandall had to make a business decision.  (Patton Aff. ¶ 25, F. Sandall

8

Dep. 154).  According to Patton, a similar conversation occurred between Patton and Paul Sandall in October 2002 (Patton Aff. ¶ 27).  Advance continued to supply labor through December 2002.

David Warren, the Risk Manager for Advance from December 2000 through the relevant period, worked with Paul Sandall to manage the Candlewood account.  Warren recommended to Paul Sandall that Advance continue to provide labor to Candlewood from July 2002 through December 2002.  Warren explained that his recommendation was based on representations made by Pryor and Patton, including representations that they would be successful in obtaining long-term financing; that they qualified for more financing than they needed to purchase the plant; that the delinquencies on the Advance account would be paid off at the time of the closing with cash generated from the closing;  and that there was "zero chance" that the deal would not close.  (Warren Aff. ¶¶ 25-26).

Advance was aware from July through December 2002 that Candlewood needed to obtain long-term financing to complete the deal, and Advance knew that Candlewood did not own the McPherson plant.  (F.Sandall Dep. 139-40; 238-39).  Frank Sandall stated that he knew it was taking a long time to arrange for the financing, but that Patton never told him that they were having trouble arranging the financing.  (*Id.* 130, 139-40; 143).  Like Wagner, Frank Sandall stated that Pryor told him during the August 29, 2002, meeting that "the chance[ ] of Candlewood not purchasing the McPherson facility was zero."   (*Id.* 209:12-19).  Wagner stated that Pryor represented that PJ Gold had to sell the McPherson plant to them.  Wagner did not know about the $100,000 "break-up" provision in the contract between McPherson Productions and PJ Gold, and there is no evidence that this information was provided to Wagner or anyone at Advance.

9

In early December 2002, Candlewood obtained a commitment for financing from Northbridge Financial that would be available December 31, 2002.  On December 12, 2002, Papa John's and PJ Gold paid $100,000 to McPherson Productions to cancel its obligations to purchase the McPherson facility.  Candlewood was ordered by the plant owners to vacate the plant, which it did.  (Patton Aff. ¶29).

Pryor identified two conditions that contributed to the parties' inability to close the deal:  the failure of Candlewood to obtain a long-term purchase order from Papa John's and the fact that Candlewood's only client was PJ Gold.   According to Pryor, even after December 13, 2002, Candlewood was in discussions about the purchase of the McPherson Plant, but McPherson Productions had no incentive to sell the plant because it had a contract in place for food production on behalf of another national food chain.

From June through November 2002, Advance was paid by Candlewood the sum of $478,501.29.  (Ex. 178).  In October 2002, Advance provided Candlewood with labor valued at $284,618; in November Advance sent labor valued at $357,719, and, in the first two weeks of December, $185,313.

**Procedural Background**

This matter was before the Court on the Defendants' motion to dismiss for failure to state a claim upon which relief could be granted.  In connection with that motion, I concluded that Kansas law applies to the fraud claims given that at the focus of this dispute is Advance's supply of temporary labor to the plant located in McPherson, Kansas.  I also concluded that the fraud claims survived the Rule 12 challenge because Advance had alleged damage separate from the damages that it seeks in connection with the breach-of-contract claim against Candlewood.

10

Now, Patton, Pryor and Hunter Wise[2] all seek summary judgment arguing that there is no evidence of fraud, and even if there is some dispute about the defendant's intent, summary judgment is warranted because Advance has not come forward with evidence of damage separate from the damages that may have flowed from the breach of contract with Candlewood.   Riedel, Kuluris, and today, White Hat, have been dismissed from this action.

## ANALYSIS

Three claims for relief remain. The Complaint's first claim alleges a breach-of-contract claim against Candlewood, which is not the subject of the pending motions.  Count III alleges fraud against Pryor, Patton, and the Hunter Wise Financial Group, and Count IV states a claim of unjust enrichment based on Advance's supply of temporary labor to the McPherson plant throughout the last half of 2002.   Picking up where the Court left off in the Memorandum and Order on their prior motions to dismiss, the Defendants contend that they are entitled to summary judgment for three reasons.  First, the Defendants did not engage in any fraud; and second, even if their conduct could be construed as fraudulent, there is no evidence that Advance sustained any additional injury beyond damages sustained as a result of the alleged breach of contract by Candlewood.  Accordingly, Defendants argue that they are entitled to summary judgment on the fraud claim stated in Count III of the Amended Complaint pursuant to *Heller v. Martin*, 782 P.2d 1241, 1246 (Kan.  App. 1989).  Third, Defendants contend that none of them was unjustly enriched by

---

[2] Candlewood and White Hat do not seek summary judgment.

the Plaintiff and that they are entitled to relief because Plaintiff cannot produce evidence to create a genuine issue for trial.

***Actionable Fraud under Kansas Law***

According to Advance, the result of several alleged misrepresentations and omissions by Pryor, Patten, Riedel and Kuluris was the creation of a scheme to induce Advance to provide "a million dollars worth of 'free' temporary labor to the McPherson facility."  In the Amended Complaint, Advance alleges specific incidents of alleged fraud by the Defendants that contributed to the scheme.  Advance alleges that the Defendants:

1.     misrepresented the extent of Hunter Wise's involvement with Candlewood and the pizza-shell operation (Amended Complaint ¶¶ 98-103);

2.     misrepresented that payments would be made over several months beginning in April 2002 and continuing through December 2002 (¶¶ 104 - 108);

3.     from May 2002 through November, 2002, misrepresented that Papa John's had placed, or in the immediate future would place, large purchase orders for pizza shells;

4.     misrepresented or concealed information about Candlewood/White Hat's power to purchase the McPherson facility and its ability to obtain financing  (¶¶ 115-119); and

5.     disguised the existence of White Hat from Advance. (¶¶ 120-121 ).

Under Kansas law, fraud may be perpetrated by affirmative misrepresentations, by silence, and by the promise of some future event.   *See Wilson v. Meeks,* 98 F.3d 1247, 1254 (10th Cir. 1996)(citing *Slaymaker v. Westgate State Bank*, 739 P.2d 444, 450 (Kan. 1987); *OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1299 (Kan. 1996); *Boegel v. Colorado*

*State Bank*, 857 P. 2d 1362 (Kan. App. 1993); *Anderson v. Heartland Oil and Gas, Inc.*,

819 P.2d 1192, 1240 (Kan 1991).

> The elements for actionable fraud by affirmative misrepresentation include (1) an untrue statement of fact, (2) known to be untrue by the party making it, (3) made with the intent to deceive or with reckless disregard for the truth, (4) upon which another party justifiably relies and (5) acts to his or her detriment.

*Bomhoff v. Nelnet Loan Services, Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)(quoting *Alires v.*

*McGehee,* 85 P.3d 1191 (Kan. 2004).

> Fraud by silence or concealment requires a plaintiff to "show *by clear and convincing evidence* the following elements: (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff."

*OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1299 (Kan. 1996) quoting *Lesser v. Neosho*

*County Community College*, 741 F.Supp. 854, 863 (D.Kan. 1990)(emphasis added).

> The tort of fraudulent promise of future events is defined as a promise made which the promisor had no intent of performing when made, made with the intent to deceive and to induce the promisee to act upon said promise, reasonable reliance on the promise by the promisee, and ultimate failure to perform by the promisor." *Anderson v. Heartland Oil & Gas, Inc.*, 819 P.2d 1192, 1200 (Kan. 1991). The gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent misrepresentation concerning a present, existing intention to perform, when no such intention existed. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816 (1979).

*Gerhardt v. Harris*, 934 P.2d 976, 981 (Kan. 1997). [3]

---

[3] A fraudulent promise of a future event must be distinguished from the tort duty underlying a negligent misrepresentation.

A negligent misrepresentation claim is breached only upon a misrepresentation of

Defendants contend that they are entitled to summary judgment because there is no evidence that Patton, Pryor or Hunter Wise engaged in fraud.   I have reviewed the voluminous evidence presented with these motions.   I agree with the Defendants' argument.

### Hunter Wise's Involvement

The evidence relative to Hunter Wise was that the four members of White Hat were independent contractors of Hunter Wise.  "Hunter Wise" did not appear as a named party to any agreement involved in this transaction.  I assume for purposes of this analysis that Pryor and Patton emphasized their experience at Hunter Wise in making their presentations to the Sandalls and other Advance employees for the purpose of demonstrating their experience and expertise in obtaining long term financing.  I also find that Pryor and Patton used Hunter Wise office space, business equipment, letterhead and business cards in connection with the Candlewood/White Hat transactions, but this evidence does not show any intent to deceive.  Rather, the evidence demonstrates that any reliance on Hunter Wise's involvement in the transaction could not have been reasonable given that 1) Riedel directed Wagner to change the contracting party's name on the "Terms of Agreement" from Hunter Wise to Candlewood; 2) the Acknowledgment

---

pre-existing or present fact. Such a misrepresentation is absent if the statement regards only future events. Thus, if a misrepresentation claim is predicated on a contractual representation regarding future occurrences, the claim necessarily relies on a contractually created duty.  Allowing a negligent misrepresentation claim to arise from failure to perform a contractual obligation would provide a tort remedy in a contract action without requiring a plaintiff to prove fraudulent intent. *Gerhardt*, 261 Kan. at 1018, 934 P.2d 976. Such a claim would arise in every breach of contract action. *Id.* 261 Kan. at 1020-21, 934 P.2d 976.

*Graphic Technologies, Inc. v. Pitney Bowes Inc.*,  998 F.Supp. 1174, 1179 (D. Kan. 1998).

14

of Responsibility identified Candlewood as the sole party liable for the Advance account; and 3) the facsimile transmission relating to the right to purchase the McPherson plant from PJ Gold does not mention Hunter Wise as a party to the transaction.   Many of the allegations in the Amended Complaint relate to representations made before the Terms of Agreement were executed (Amended Complaint at ¶¶ 101 (a)-(d)), and the Terms of Agreement clearly states that any prior understandings, which would include representations about Hunter Wise's involvement in the transaction, "were not binding." Finally, it appears that Paul Sandall acknowledged as much during a phone conversation with Pryor and Riedel that occurred in November 2002, during which he expressly distinguished between the roles of Candlewood and White Hat and that of Hunter Wise. (Filing No. 153, Mullen Aff. Ex. B).

### *Pizza Shell Order and Production Capability*

Advance also alleges fraud based on misrepresentations about the size of the pizza shell orders placed by Papa John's. (Amended Complaint ¶ 114).   Plaintiff's alleged that Papa John's placed two purchase orders for pizza shells.  The first was through a Binding Letter of Intent ("BLOI") addressed to Heartland Gold Foods dated February 28, 2002.  The BLOI was one asset that Candlewood purchased from Heartland Gold in June 2002.  A second order was placed on October 10 or November 4, 2002, and was contingent upon Candlewood securing the financing for the plant.

The evidence demonstrates that Advance and Candlewood/White Hat were operating under the belief that Papa John's would come forward with a long-term order once the operation was in place and the deal on the MacPherson plant closed, but there

15

is no genuine dispute that both parties were making projections and they understood no long-term contract was in place, as this testimony from Frank Sandall supports.

> Q:   Do you recall [the Defendants] telling you that at any point, that they had a firm purchase order after 2002 from Papa John's?
>
> A:   After 2002?
>
> Q:   Correct.
>
> A:   Not to my knowledge.
>
> \*   \*   \*
>
> Q:   So, in the summer and fall of 2002, you were aware that Candlewood did not have a long-term purchase contract with Papa John's for pizza shells?
>
> A:   Correct.
>
> Q:   What do you contend that they said in Phoenix [August 29, 2002] that was fraudulent.  Just the fact that we think we can get it done and could get it done?
>
> A:   I believe they overestimated purchase order, the customer base that would be coming because of the fire.  I believe they overstate[d] the, the ability – the interest that Papa John's had in their product.

(F. Sandall Dep. 225, 247, 251).  Frank Sandall also stated that he believes the Candlewood representatives overestimated their production capability, and yet he stopped short of characterizing their overestimating as intentional deception.  (F. Sandall Dep. 239-242.)   There is no evidence that the Defendants' overestimating was conducted in anything other than good faith, and there is no evidence that they intentionally misrepresented their orders or production capabilities.  Advance knew that Candlewood

16

did not have a long-term agreement from Papa John's, or any other customer, in hand. Accordingly, the proof to support the fraud allegations related to the size of the purchase orders is not sufficient to support a claim of fraud.

**White Hat's Existence**

Advance alleges that the Defendants attempted to keep the existence of White Hat a secret from them.  The evidence is to the contrary. Reference to White Hat is made in the facsimile transmission from Riedel to Wagner, and Wagner admitted that he must have seen the reference to White Hat but did not inquire about it. (Wagner Dep. at 155). Additionally, I find that Advance's effort in obtaining a credit report on Candlewood, but then not doing much with it, and Advance's lack of interest in Candlewood's capitalization and corporate structure demonstrate that Advance did not rely on representations about corporate structure in making its decision to continue to supply labor to the McPherson plant.

**Financing and the McPherson Plant**

Advance also alleges that the Defendants' assurances that the financing was in place, or would be in place for a closing in December 2002, was fraudulent.  I disagree. Both Paul and Frank Sandall have testified that they knew the Defendants had to secure long-term financing in order for the deal to close, and that it was taking a long time for the financing to be secured.  Paul Sandall admitted that he decided to continue to supply labor in part because he knew that Advance's best chance of getting paid was from the net proceeds of the sale if it closed.

Frank Sandall testified that he knew Candlewood's goal was to purchase the McPherson facility and that he knew that Candlewood was going to have to get financing

17

in order to purchase the facility.  He also knew that the amount they needed to finance was significant.  He agreed that from June 2002 through December 14, 2002, he understood that the Candlewood representatives were trying to get financing and to make arrangements and close the deal.  (F. Sandall Dep. 238-239).

David Warren attended the August 29, 2002, meeting in Phoenix.  According to Warren, Pryor stated that PJ Gold was contractually bound to sell the McPherson facility to the Defendants, that the facility was worth more than they had agreed to pay for it, and that the Defendants qualified for 15 million dollars in financing which would leave 4.5 million dollars in net proceeds available at the time of the closing to repay vendors, including Advance.  When Warren asked Pryor what the chances were of the deal not closing, Pryor allegedly said that there was "zero" chance because PJ Gold had to sell the facility to them under contract.  (Warren Aff. ¶¶ 1, 12, 15 -19).

There is, at a minimum, a genuine issue as to whether Pryor represented that there was  "zero chance" that PJ Gold would not sell the facility to Candlewood.  If Pryor made the statement, then it was misleading given that Pryor and Patton knew or could have known that PJ Gold had the right to withdraw from the McPherson facility transaction with a payment of $100,000 to McPherson Productions.  I have found no evidence that this "break-up" provision was disclosed to Advance.  Therefore, I find that the only genuine issue relates to Pryor and Patton's superior knowledge about the contract between McPherson Productions and PJ Gold, and specifically about PJ Gold's right to cancel its contract to purchase the plant with the $100,000 payment to McPherson Productions.

18

Fraud by silence or concealment requires Advance to show "by clear and convincing evidence" that 1) the Defendants had knowledge of material facts that Advance did not have and could not have discovered in the exercise of reasonable diligence, 2) that Defendants were under an obligation to communicate the material facts to Advance; 3) that Defendants intentionally failed to communicate to Advance the material facts; 4) that Advance justifiably relied on Defendants to communicate the material facts to it; and (5) that Advance sustained damages as a result of Defendant's failure to communicate the material facts to Advance. *See OMI Holdings, Inc.*, 918 P.2d at 1299.

The evidence from Warren's affidavit at a minimum creates a genuine issue regarding four of the five elements stated above.  According to Warren,  Pryor and Patton stated that PJ Gold *was contractually bound to sell* the plant to Candlewood/White Hat. Given the evidence that Pryor and Patton had knowledge of the $100,000 "break up" provision contained in the contract between PJ Gold and McPherson Productions, it could be argued that, under the circumstances, Pryor and Patton had an  obligation to disclose that information to Advance and that Advance justifiably relied on the Defendants to communicate that fact to it.   Even if I take those facts as true, however, the facts only become material and sufficient to defeat the Defendants' motions if Advance can also show that it sustained damages as a result of the Defendants' failure to communicate the fact of the "break up" provision to it.

Because, as is more fully explained below, I find that Advance sustained no damages separate from the breach-of-contract damages based on this alleged failure to communicate the "break up" provision to Advance, I conclude as a matter of law that there

are insufficient facts to sustain the Plaintiff's fraud claims against Pryor, Hunter Wise and Patton.

### Representations regarding Papa John's Liability

Advance opposes the summary judgment motions arguing that it has come forward with evidence sufficient to show that the Defendants engaged in fraud and, as a result, the Plaintiff has sustained damage separate from the breach-of-contract damages, including attorney's fees and costs associated with the commencement of a legal action against Papa John's International.   Advance contends that it relied on Defendants' misrepresentations relative to the liability of Papa John's International and its subsidiary, PJ Gold, for payment of Advance's account.

Defendants respond by demonstrating that this action is the only action in which Papa John's International and PJ Gold have been named as defendants by Advance; that Advance did not seek any discovery from the Papa John defendants prior to voluntarily dismissing them; and that in the course of discovery not a single statement for professional services relative to that work has been produced.

Advance's evidence in support of the fraud claim is that Heartland Gold Foods' President, Rodney Graf, informed Frank Sandall and Greg Wagner that PJ Gold, the Papa John's International subsidiary, was ultimately responsible for payment of the Advance account.  (F. Sandal Affidavit and Wagner Affidavit).  There is no evidence that Rodney Graf was acting as an agent of the Defendants at the time he made these remarks, and his authority to speak for the Defendants is particularly suspect because the parties to the conversation cannot remember when it occurred.  Thus, I conclude there is no basis for

20

holding Candlewood, Hunter Wise, Pryor or Patten responsible for the statements made
by Rodney Graf to Frank Sandall and Greg Wagner.

Advance also presents evidence that Warren subsequently asked Pryor about PJ
Gold's responsibility for payment to Advance, and Advance would have the Court believe
that Pryor confirmed Papa John's liability. Pryor's response was equivocal. He offered his
opinion that PJ Gold might be liable for Advance's account because PJ Gold and Papa
John's International were receiving the benefit of the labor, but Pryor qualified his opinion
as being that of a non-lawyer interpreting a contract. The evidence of the phone call
reveals the following exchange:

> David Warren:     Okay so the paper work will show that Papa John's is
> ultimately responsible?
>
> Gary Pryor:  That is what I believe but I am not an attorney. Okay. Remember
> when I am telling you that because there are a number things in there
> as an attorney he could point out to you that show they have
> responsibilities, but those are based on certain legal sections of our
> contract.
>
> David Warren:     Okay.
>
> Gary Pryor:  And that's you know, and the key would be for you to be able to use
> that in any worse case scenario to make sure that you get [inaudible],
> but because there is a legal contract, there is legalese in there that
> your attorneys and he would have to work through in order for you to
> make the right claim under the right circumstances with the right legal
> jurisdiction or whatever that is.

(Warren Aff. Ex. B ¶¶ 1-2). I do not find within the transcript of that tape-recorded
conversation between Pryor and Wagner a misstatement of fact. Rather, Pryor's
statements are undeniably opinions. Opinions do not constitute a basis for fraud unless
there is also shown an intention to deceive, which I do not find. There is no evidence that
Pryor did not believe what he was saying to Warren, and so the necessary intent to

deceive is also missing. Moreover, even if Pryor's opinions could be construed as misstatements of fact rather than opinion, I conclude that any reliance by Advance on Pryor's statements was not reasonable, given the qualifications and contingencies expressed in Pryor's statement to Warren, and given the representation that Advance was consulting with legal counsel and was free to communicate directly with Papa John's representatives. I conclude as a matter of law that Advance's evidence offered in support of its allegations of fraud relative to Papa John's does not create a genuine issue of material fact and is not sufficient to overcome the Defendants' motion for summary judgment on this part of the fraud claim.

### *Heller v. Martin Analysis*

I agree that Advance has not produced evidence to show that it sustained an injury or damages separate from the damages flowing from the Defendants' alleged breach of contract. The prayer for relief contained in Count I, Breach of Contract against Defendant Candlewood, states:

> WHEREFORE, Plaintiff Advance Services, Inc. demands judgment be entered against Candlewood Shells LLC, for (1) $1,084,612.50 in compensatory damages, (2) pre-judgment interest, (3) post-judgment interest, (4) costs, and (5) such other relief as the Court deems just and proper.

(Filing No. 93 at 17). The prayer for relief contained in Count III, Fraud against remaining Defendants Pryor, Patton, and Hunter Wise, states:

> WHEREFORE, Plaintiff Advance Services, Inc. demands judgment be entered against the Defendants, and each of them, for (1) the value of the benefits unjustly retained in an amount not less than $1,084,612.50, (2) pre-judgment interest, (3) post-judgment interest, (4) costs, and (5) attorneys fees, expenses and costs of pursuing litigation against Papa Johns, and (6) such other relief as the Court deems just and proper.

22

(Filing No. 93 at 29).   These prayers are very similar, excepting as the Court previously noted the attorneys fees and expenses related to pursuing litigation against Papa John's.

I conclude that Advance has not overcome the hurdles outlined in the *Heller v. Martin* case, specifically that a plaintiff alleging fraud in connection with a contract must demonstrate some damage separate and apart from the breach of contract damages in order to continue under a fraud theory.

> A breach of contract action cannot be turned into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriment from its breach.  The independent tort of fraud must cause damages beyond those suffered by breach of contract.

*Heller*, 782 P.2d at 1245-46 (citations omitted).  This rule or a derivation of it has been widely applied by other courts applying Kansas law.

> Kansas courts and the Tenth Circuit have consistently refused to allow tort claims to co-exist with breach of contract claims when the two are grounded in the same facts.  *See Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th Cir. 1984); *Ritchie Enter. v. Honeywell Bull, Inc.,* 730 F.Supp. 1041 (D.Kan.1990); *L.R. Foy Constr. Co., Inc. v. Prof'l Mech. Contractors,* 13 Kan.App.2d 188, 194, 766 P.2d 196 (1988); *Ford Motor Credit Co. v. Suburban Ford*, 237 Kan. 195, 699 P.2d 992 (1985).  Doing so would permit plaintiffs to proceed on claims in tort and contract, thereby allowing the potential for double recovery.

*Foodbrands Supply Chain Services, Inc. v. Terracon Inc.*,  2003 WL 23484633, at 6 (D.Kan. 2003).

Advance simply has not come forward with evidence that separate damages are involved.  It its briefs opposing the motions, Advance relies on the Court's observation in connection with the motion to dismiss that the Plaintiff had alleged some separate damage resulting from its action against Papa John's.  However, in this phase of the proceedings,

a plaintiff must come forward with evidence to demonstrate a genuine issue for trial, and I find that Advance has failed to satisfy its burden.

Advance can show that there is a genuine issue of fact regarding whether Patton and Pryor knew about the "break up" provision in the PJ Gold and McPherson Productions contract and intentionally kept that information from Advance.  However, this fact is not material unless Advance can also show how this alleged fraud might have caused damage to it different from what was sustained because the contract was breached.  Advance has failed to show this necessary element.  Because Advance cannot show that it has sustained damages separate and apart from the breach-of-contract damages for the temporary labor supplied by Advance to the McPherson facility, I conclude that summary judgment should be entered as a matter of law as to all the Defendants named in Count III.

### Unjust Enrichment

Advance also asserts a claim based on a theory of unjust enrichment.  Advance alleges that it provided temporary labor to Candlewood, and that the Defendants, Patton, Pryor, Hunter Wise and White Hat were unjustly enriched by the value of those services. To state a claim for unjust enrichment, Advance must show that 1) it conferred a benefit on the defendant; 2) the benefit was known to or appreciated by defendant; and 3) the benefit was accepted or retained by defendant under such circumstances as to make it inequitable or unjust for the defendant to retain the benefit.  *T. R. Incorporated of Ashland v. Brandon*, 87 P.3d 331, 336 (Kan App. 2004); *Haz-Mat Response Inc. v. Certified Waste Services, Ltd.*, 910 P.2d 839, 846-47 (Kan. 1996).

24

Defendants argue that the unjust enrichment claims against them fail because Advance's services were provided to Candlewood, and not to Pryor, Patton, or Hunter Wise. None of the movants was an owner of Candlewood, and none of them accepted or retained any benefit provided by Advance. The Defendants also argue that there is no proof of benefit that inured to any of them. Pryor and Patton each lost approximately $400,000 in cash, and both Pryor and Patton have unsatisfied judgments against them in amounts in excess of $400,000. (Pryor Aff. ¶ 45-46; Patton Aff. ¶ 30).

I also note that a claim for unjust enrichment is available only where, as a matter of fact, there is no legal contract. In this case, there is a contract for the payment of the services provided, and that contract is with Candlewood, and not these Defendants. Because there is an adequate legal remedy under the contract, an unjust enrichment claim must fail. That is true, even when the legal remedy exists only against an insolvent party. 66 Am. Jur. 2d *Restitution* §30 at 627.

Because I conclude that Advance has a legal remedy against Candlewood, and there is no evidence that Patton, Pryor, or Hunter Wise was unjustly enriched by benefit of the labor supply provided by Advance, I conclude that the movants are entitled to summary judgment on Count IV.

## CONCLUSION

The undisputed evidence is that Advance understood that it was risking non-payment of the account if the deal did not close, and Advance understood that Candlewood/White Hat, from July through December, was attempting to obtain long-term financing. Based upon the parties' prior dealings, Advance knew that only Candlewood was liable for payment of the temporary labor supplied by it given Riedel's requested

change to the draft "Terms of Agreement" naming Candlewood rather than Hunter Wise, and given the Acknowledgment of Responsibility that stated that Candlewood was solely responsible for payment of the account. Moreover, Advance knew that Pryor and Patton were unwilling to provide personal guarantees based on conversations that occurred in August and September 2002.

The undisputed evidence supports a finding that Frank and/or Paul Sandall understood and appreciated the business risks that they were assuming as Advance continued to supply temporary labor to the McPherson plant. Paul Sandall has stated that he continued to supply labor, even after it became clear that he was not being paid in a timely manner for labor previously provided, because he understood that Advance's best chance of getting paid the delinquent amounts was to be paid from net proceeds available after the closing. Even if Advance had been aware of PJ Gold's right to cancel the purchase agreement for the facility, there is no indication that Advance would have stopped providing temporary labor to the plant.

For all these reasons,

IT IS ORDERED:

1.      The Motion for Summary Judgment filed by Frank Patton (Filing No.149) is granted;

2.      The Motion for Summary Judgment filed by Gary Pryor and Hunter Wise (Filing No. 148) is granted;

3.      The Stipulation for Partial Dismissal (Filing No. 174) is approved, and the relief requested therein is granted;

4.      All claims stated in Count II based on alter ego liability against Frank Patton, Gary Pryor, and White Hat Food and Beverage, LLC, are dismissed without prejudice;

5.      A separate judgment in favor Defendants Frank Patton, Gary Pryor, and Hunter Wise Financial Services and against the Plaintiff Advance Services, Inc. on all claims in Count III based in fraud, and on all claims in Count IV based on unjust enrichment, shall be entered at the conclusion of the trial; and

6.      The remaining claims shall proceed to trial, which is scheduled to commence on Tuesday, August 29, 2006.  The remaining claims are Count I, Breach of Contract against Candlewood, and Count IV, Unjust Enrichment against Candlewood and White Hat Food and Beverage Group, LLC.

Dated this 15th day of August, 2006.


                              BY THE COURT:

                              s/Laurie Smith Camp
                              United States District Judge